# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# DIVISION OF ATLANTA

| | |
|---|---|
| SEAN GORDON and BRANDON MEISNER, on behalf of themselves and all others similarly situated,<br><br>            Plaintiffs,<br><br>    v.<br><br>EQUIFAX INC.,<br><br>            Defendant. | No.<br><br>COMPLAINT – CLASS ACTION<br><br>JURY TRIAL DEMANDED |

*"We think the impact is really going to be quite small, not something that is meaningful to Equifax"*

*Mark Begor, Equifax CEO, on Equifax's reporting inaccurate information for millions of consumers*

## NATURE OF THE CASE

1.      The importance of credit to the American public cannot be overstated. Simply put, credit is synonymous with the concept of hope. It is not merely a mechanism to advance one's economic opportunities by providing individuals with the tools they need to obtain their financial goals, but a means of accessing the necessities of life. Credit is often the thing that allows a family to move out of a

1

rental apartment and into a house that they can consider a home, fulfill their educational goals, or buy the car they need to get to work.

2.     It follows that Americans rely on credit reporting agencies, like Equifax, to accurately report their credit scores to lenders so that they can initially acquire those loans. Americans rely on credit reporting agencies to follow reasonable procedures to provide accurate and complete data to lenders—indeed, Americans' very livelihoods depend upon it. Because Credit Reporting Agencies have so much power over our economic lives, Congress requires them to adopt reasonable procedures for reporting consumer credit information with the maximum possible accuracy.

3.     Unfortunately, Equifax failed in that duty. Instead of investing the money necessary to maintain reliable computer systems, Equifax relied on antiquated and error-prone "legacy" systems to report credit information on millions of consumers. It compounded the risks of using antiquated systems by writing faulty computer code that it then failed to adequately test before implementing. Equifax has not disclosed how long it relied on these shoddy practices, which fall well below the "maximum possible accuracy" standard that federal law requires.

4.      In the end, Equifax's reckless practices caught up with it. Between March 17 and April 6, 2022, Equifax misreported credit information on millions of consumers. Equifax admits that the problem stemmed from a coding error related to one of its antiquated "legacy systems." Equifax knows that its use of out-of-date computer systems is a problem, that developing patches to let these antiquated systems work with modern applications increases the likelihood of errors, and that failing to properly test its computer code further compounds the problem. Had Equifax simply followed standard software development practices, adequately tested its code before implementing it, or retired its legacy systems when they became obsolete, these problems never would have occurred, and Equifax would not have harmed Plaintiffs and millions of others.

5.      Plaintiffs Sean Gordon and Brandon Meisner, two of the many victims of Equifax's misreporting, had inaccurate and adverse credit information submitted to third-party lenders during their automobile loan application processes.

## PARTIES

### A. Plaintiff Sean Gordon

6.      Plaintiff Sean Gordon is a citizen of Ohio and a resident of Hartville, Ohio. On March 29, 2022, Gordon visited a car dealership and attempted to take out an auto loan. Although Gordon monitored his credit score on a daily basis and

knew his score was in the high 600's, Equifax reported his credit score as just 545—a roughly 150-point drop. Because of Equifax's inaccurate lowered credit score reporting, the lender initially denied Plaintiff's automobile loan to finance a new car. After further negotiations, the lender agreed to finance the loan, but only if Gordon obtained a co-signor and paid a substantially higher interest rate. As a result of Equifax's inaccurately reporting his credit information, Gordon had to finance his purchase at a 13.4% interest rate instead of the 3.4% rate he had been previously offered. Neither the co-signor requirement nor the interest-rate hike would have been necessary had Equifax accurately reported his credit information.

### B. **Plaintiff Brandon Meisner**

7.       Plaintiff Brandon Meisner is a citizen of Indiana and a resident of Milford, Indiana. On April 5, 2022, Meisner applied for an automobile loan to purchase a used car at a dealership. The car dealership denied his loan because Equifax reported his credit score as being 40 to 60 points lower than it actually was. Had Equifax accurately reported his credit information, Meisner would have been able to purchase the vehicle he needed.

8.       Both Plaintiffs and all Class members suffered injuries-in-fact because Equifax disclosed inaccurately low credit information about them to third parties, often resulting in denials or worse terms for loans as a result of Equifax's reckless

failure—in violation of the FCRA—to implement reasonable procedures to ensure the maximum possible accuracy of its consumer credit reporting information.

## C. **Defendant**

9.        Defendant Equifax Inc. is one of the three largest consumer credit reporting agencies in the country. Equifax is domiciled in Georgia and has its headquarters and principal place of business at 1550 Peachtree Street, NW, Atlanta, Georgia 30309.[1] Equifax employs 13,000 people worldwide. Its revenue in 2021 was $4.9 billion. *Id.*

## JURISDICTION AND VENUE

10.        This Court has original jurisdiction under 28 U.S.C. § 1331 because Plaintiffs' claims arise under the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.*, which is a federal statute; this dispute, therefore, involves a federal question.

11.        This Court also has subject matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d) because there are more than 100 Class members nationwide, the aggregate amount in controversy exceeds $5 million exclusive of interest and costs, and because Plaintiffs and Class members are of diverse citizenship from Defendant.

---

[1]        Equifax Inc., https://www.equifax.com/about-equifax/who-we-are/ (last visited Sept. 1, 2022).

12.     This Court has personal jurisdiction over Defendant because it maintains its principal place of business in Georgia. It has continuous and systematic contacts with Georgia such that it has sufficient minimum contacts here. Defendant intentionally avails itself of this jurisdiction by maintaining and conducting its corporate operations in Georgia.

13.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391 because Equifax is headquartered and has its principal place of business in this District, intentionally and regularly conducts business in this District, and a substantial part of the events, omissions, and acts giving rise to Plaintiffs' claims herein occurred in this District.

## FACTUAL ALLEGATIONS

### A. Equifax Misreported Consumers' Credit Information

14.     As described above, Plaintiffs Gordon and Meisner were injured when Equifax misreported inaccurate and negative information about their creditworthiness to potential lenders.

15.     Equifax is one of the three major credit reporting agencies and is, therefore, relied on by hundreds of thousands of consumers and lenders per day to determine the credit worthiness of consumers applying for loans. As Equifax acknowledges, its "unique data and analytics change millions of lives across the

world."[2] Unfortunately, in March and April 2022, Equifax changed many lives for the worse.

16.     In May 2022, Equifax began acknowledging its errors, but even then it downplayed the scope of the problem. On May 27, 2022, Equifax admitted discovering a "coding issue" that affected a limited set of credit information. It quietly began notifying lenders that data elements for the "number of inquiries within one month" or "age of oldest tradeline" were potentially incorrect in credit reports generated using the affected system.

17.     Later, in June 2022, Mark Begor, Equifax's Chief Executive Officer, acknowledged at an investor conference that Equifax had a "coding issue that was a mistake made by our technology team, in one of our legacy applications that resulted in some scores going out with incorrect data." Knowing that millions of consumers were affected, Mr. Begor stated that the impact was "quite small" and "not something that is meaningful to Equifax."

18.     Finally, in August 2022, Equifax issued a formal statement and admitted that it identified a coding issue in its computer systems used to calculate certain elements, or attributes, of a credit score. Unfortunately, that impact was not

---

[2]     Equifax Inc., https://www.equifax.com/about-equifax/who-we-are/ (last visited Sept. 1, 2022).

"quite small" and instead affected about 12% of all credit scores Equifax provided between March 17 and April 6, 2022. Equifax also publicly acknowledged that approximately 300,000 consumers' credit scores were inaccurately reported by 25 points or more.

19.     Since the incident, several members of Congress have spoken out and condemned Equifax for its actions, stating the event was "deeply troubling." Rep. Maxine Waters even went so far as to ask the Consumer Financial Protection Bureau to prohibit Equifax from furnishing credit scores to lenders until it can prove its controls are sufficient.

20.     Equifax has since reported that the issue is fixed, though consumers have no way to independently verify whether Equifax is providing accurate information. Given Equifax's pattern of minimizing its failings, consumers are justifiably skeptical that Equifax finally has disclosed the full scope of the problem.

**B. Equifax is Required to Ensure Accuracy in Consumer Reports under the FCRA.**

21.     As a consumer reporting agency, Equifax is subject to the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq*. ("FCRA"). "The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods

undermine the public confidence which is essential to the continued functioning of the banking system." 15 U.S.C. § 1681 (a)(1). Further, "[c]onsumer reporting agencies have assumed a vital role in assembling and evaluating consumer credit and other information on consumers." *Id.* § 1681 (a)(3). Accordingly, the FCRA requires credit reporting agencies to adopt reasonable procedures to ensure the "maximum possible accuracy" of the consumer credit information and credit reports it furnishes to lenders. *Id.* § 1681e.

22.    As the CFPB noted, "[a]ccuracy in consumer reports is of vital importance to the consumer reporting system, particularly as consumer reports play an increasingly important role in the lives of American consumers." Fair Credit Reporting, 86 Fed. Reg. 62468 (Nov. 10, 2021).

23.    A consumer report, under the FCRA, is "any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility" for a loan. 15 U.S.C. § 1681a(d)(1).

24.    Equifax is subject to the FCRA and creates and sells consumer reports or "credit reports" showing a consumer's credit information to lenders and other

businesses. These reports are used to determine whether to extend a loan and if so, on what terms. Equifax may perform credit reporting services only if it adheres to the requirements of the FCRA and other laws meant to protect the accuracy of consumer credit information.

### C. **Equifax Acted Willfully in its Failure to Provide "Maximum Possible Accuracy"**

25.     Equifax blames its inaccurate provision of lower credit scores on a "coding issue within a legacy, on-premises server environment [that was] slated to be migrated to the new Equifax Cloud infrastructure."[3]

26.     A legacy system is an outdated computer system or application based on obsolete technology or equipment. "It is generally a pejorative term, and when used suggests that the system needs to be replaced."[4] In other words, Equifax provided the inaccurate credit information by relying on an obsolete computer system and then compounded the risks by implementing faulty computer code.

27.     In another attempt to minimize its culpability, Equifax admitted that it intended to replace the risky legacy system by building a new cloud environment

---

[3]     Equifax Statement on Recent Coding Issue, https://www.equifax.com/newsroom/all-news/-/story/equifax-statement-on-recent-coding-issue/ (last visited Sept. 1, 2022).
[4] Market Business News, https://marketbusinessnews.com/financial-glossary/legacy-system-definition-meaning/ (last visited Sept. 1, 2022).

to "provide additional controls and monitoring that will help to detect and prevent similar issues in the future." But Equifax's statements underscore that it was running legacy software that it acknowledged needed to be replaced. Any controls and monitoring in place as part of the legacy software did not constitute reasonable precautions, especially in light of Equifax's own admission that the software needed to be replaced. Equifax was running this software during the three-weeks when it misreported lower credit scores, harming millions of consumers.

28.     Equifax is well aware of the risks it takes and harms it can cause by continuing to use legacy systems. In fact, this Court has already ordered Equifax to address the problem. In the multi-district litigation stemming from the massive 2017 Equifax Data Breach, which was venued in this District, Judge Thrash entered a Consent Order requiring Equifax to remediate its legacy systems and develop a governance process to retire its systems when they become antiquated. *See In Re Equifax, Inc., Customer Data Security Breach Litig.*, No. 1:17-md-02800, Dkt 958 § 14 (entered January 13, 2020).

29.     As such, Equifax is well aware of the risks associated with relying on antiquated computer systems, yet it knowingly and intentionally failed to implement reasonable safeguards to ensure maximum accuracy of consumer information.

**D. Equifax's Actions Have Caused Plaintiffs and the Class Harm.**

30.     Every day, lenders request hundreds of thousands of credit reports

from credit reporting agencies, like Equifax, to assist them in making decisions

that, as Equifax put it, "impact some of life's most pivotal moments."

31.     According to the CFPB, "inaccurate information in consumer reports

can have significant adverse impacts on consumers. These impacts are particularly

concerning for prospective renters and job seekers struggling to recover from the

impacts of the COVID–19 pandemic." Fair Credit Reporting, 86 Fed. Reg. 62468

(Nov. 10, 2021). The CFPB also pointed out that "[c]onsumers with inaccurate

information in their consumer reports may, for example, be denied credit or

housing they would have otherwise received or may be offered less attractive terms

than they would have been offered if their information had been accurate." *Id*. As

such, the "maximum possible accuracy" requirement "remains as important today

as it was when the statute was enacted in 1970." *Id*. at 62469.

32.     Plaintiffs and the Class members are victims of Equifax's failure to

ensure "maximum possible accuracy" as Equifax shared inaccurately low credit

scores with lenders. Not only that, but Plaintiffs and Class members were also

denied loans, offered credit only at the cost of higher interest rates or less favorable

terms, lost out on rental housing, and suffered impacts that prohibited them from accessing, or made much more costly, other vital services.

33.     The harms felt from Equifax's error are widespread and vast, ranging from mortgages and auto loans to personal loans and other forms of credit. The *Journal* reported that "Equifax told one large auto lender that about 10% of applicants during the three-week period had inaccurate scores" and "[o]f those, several thousand saw a change of 25 points or more on their credit score[.]" Further, "at one big bank, for example, 18% of applicants during the three-week period had incorrect scores, with an average swing of 8 points." Andrew Ackerman & AnnaMaria Andriotis, *Equifax Sent Lenders Inaccurate Credit Scores on Millions of Consumers*, The Wall Street Journal (August 2, 2022), https://www.wsj.com/articles/equifax-sent-lenders-inaccurate-credit-scores-on-millions-of-consumers-11659467483. Finally, some applicants were incorrectly reported as having no credit score at all.

34.     Thus, as a result of Equifax's inaccurate reporting of their credit information, Plaintiffs and the Class members have suffered the following harms:

     a.  impairment of their ability to borrow and/or to obtain credit;

     b.  loss of use of and access to financial accounts and/or credit;

   c.  lowered credit scores resulting from credit inquiries following inaccurate reports being provided to lenders;

   d.  fees and lost time expended to obtain credit reports in order to monitor their credit records as a result of Equifax's error; and

   e.  money and time expended to free up assets to compensate for the loss of credit resulting from inaccurate credit scores.

35.    Unfortunately, this list is not exhaustive. Many Class members were also forced to pay fees to request additional credit reports, as federal law only requires credit agencies to provide one free report within a year. As such, many Class members also suffered out-of-pocket damages due to Equifax's conduct.

36.    Finally, Equifax is liable to every Class member for statutory damages under the FCRA, which provides for $1,000 in damages for each instance of willful noncompliance, of which there are likely millions. 15 U.S.C. § 1681n(a)(1)(A).

37.    Equifax willfully failed to comply with the FCRA requirement to assure "maximum possible accuracy." 15 U.S.C. §§ 1681e(b), 1681n(a)(1)(A). Equifax knew of the risks associated with using faulty code and maintaining antiquated computer systems. Despite that, Equifax continued to provide inaccurate credit reports to third-party lenders when it knew or should have known

of the inaccuracies. As such, Equifax created an unjustifiably high risk of harm to

consumers that was known or should have been known.

## CLASS ACTION ALLEGATIONS

38.     Plaintiffs seek certification of the following Class under Rules 23(a),

(b)(2), (b)(3) and/or (c)(4) of the Federal Rules of Civil Procedure:

> All individuals and entities in the United States about whom Equifax
> reported inaccurate and adverse items of information to a potential lender as
> a result of the coding error that Equifax claims caused inaccurate credit
> reporting between March 17, 2022 and April 6, 2022 (the "Class").

39.     Excluded from the Class are Defendant, Defendant's subsidiaries and

affiliates, their officers, directors and members of their immediate families, and

any entity in which Defendant has a controlling interest, the legal representatives,

heirs, successors or assigns of any such excluded party, all customers who make a

timely election to be excluded; governmental entities; and all judges assigned to

hear any aspect of this litigation, their immediate family members, and chambers

staff.

40.     Plaintiffs reserve the right to modify or amend the definition of the

Class and/or add Subclass(es) before the Court determines whether certification is

appropriate.

41.      The Class meets the criteria for certification under Rule 23(a), (b)(2), (b)(3) and (c)(4).

42.      **Numerosity:** The Class members are too numerous to feasibly be joined in a single lawsuit given that the Class consists of likely millions of individuals whose credit information was inaccurately reported by Equifax. The exact number and identities of the members of the proposed Class are unknown at this time and are within the exclusive knowledge of, and can be ascertained only through, Defendant's computer system. Equifax has the administrative capacity through its computer systems and other records to identify all members of the Class, and such information is not otherwise available to Plaintiffs and the Class.

43.      **Commonality and Predominance:** Common questions of fact and law exist with respect to all Class members and predominate over any questions affecting only individual members. The common questions include, without limitation:

> a.   Whether Equifax willfully failed to use reasonable procedures to ensure the information included on and in its consumer credit reports was accurate;
>
> b.   Whether Equifax, during the class period, adequately disclosed its credit-reporting error to the Class;

16

c.  Whether Equifax's conduct violates the FCRA;

d.  Whether Equifax used reasonable procedures to ensure the accuracy of the Class's credit reports;

e.  Whether Equifax has been unjustly enriched by its conduct;

f.  Whether Equifax acted willfully or negligently by allowing the continuous inaccurate reporting of credit scores without a remedy;

g.  Whether the Class is entitled to injunctive relief to enjoin the unlawful conduct alleged herein, and the suitable form of such relief;

h.  Whether Plaintiffs and the Class have sustained harm by consequence of Equifax's conduct and, if so, the appropriate measure of damages or equitable monetary relief; and

i.  Whether Plaintiffs and the Class are entitled to attorneys' fees and costs.

44.  **Typicality:** Plaintiffs' claims are typical of the claims of other Class members, as all members of the Class were uniformly affected by Equifax's wrongful conduct in violation of law as complained of herein.

45.  **Adequacy:** Plaintiffs will fairly and adequately represent the Class's interests. Plaintiffs have no conflicts with any other member of the Class. Plaintiffs

have retained counsel who are competent and have experience in prosecuting

complex class-actions, consumer-protection lawsuits, and privacy litigation.

46.     **Superiority**: A class action is superior to any other available means

for the fair and efficient adjudication of this controversy, and no unusual

difficulties are likely to be encountered in the management of this class action. The

damages or other financial detriment suffered by Plaintiffs and Class members are

relatively small compared to the burden and expense that would be required to

individually litigate their claims against Equifax, so it would be impracticable for

Class members to individually seek redress for Equifax's wrongful conduct. Even

if Class members could afford litigation, the court system could not. Individualized

litigation creates a potential for inconsistent or contradictory judgments and

increases the delay and expense to all parties and the court system. By contrast, the

class action device presents far fewer management difficulties and provides the

benefits of single adjudication, economies of scale, and comprehensive supervision

by a single court.

47.     Defendant acted or failed to act on grounds generally applicable to the

Class, thereby making appropriate final injunctive relief with respect to the Class

as a whole. The prosecution of separate actions by individual Class members

would create a risk of inconsistent or varying adjudications with respect to

individual Class members that would establish incompatible standards of conduct for Equifax. Such individual actions would create a risk of adjudications which would be dispositive of the interests of other Class members and impair their interests. Equifax has acted and/or refused to act on grounds generally applicable to the Class as a whole, making final injunctive relief or corresponding declaratory relief appropriate.

## FIRST CLAIM

### Willful Violations of the Fair Credit Reporting Act
### 15 U.S.C. § 1681 *et seq.*

48.      Plaintiffs hereby reallege and incorporate the preceding paragraphs as if fully stated herein.

49.      Plaintiffs bring this cause of action on their own behalf and on behalf of the Class.

50.      Plaintiffs and Class members are consumers entitled to the protections of the FCRA. 15 U.S.C. § 1681a(c).

51.      The FCRA requires credit reporting agencies to adopt reasonable procedures to ensure the "maximum possible accuracy" of the consumer credit information it furnishes lenders. 15 U.S.C. § 1681e. As discussed in depth above, Equifax failed to use reasonable measures to ensure the maximum possible

accuracy of Plaintiffs' and Class members' credit information, by, among other reasons, failing to:

- Retire legacy systems and transfer their functions in a way that reduces risks to the integrity of the data that they hold;

- Implement monitoring systems to catch inaccuracies in credit information;

- Adequately test computer code before it is deployed in a production environment;

- Assess the risks of utilizing code that could – and did – result in inaccurate credit information being sent to lenders; and,

- Promptly correct reporting errors as opposed to permitting inaccuracies to be continuously disseminated for three weeks.

52.     Equifax's actions or inactions were objectively unreasonable in ensuring the maximum possible accuracy of consumer reports.

53.     Equifax acted with reckless disregard because it either knew or should have known that its actions and/or inactions entailed an unjustifiably high risk of harm to Plaintiffs and the Class, as detailed above.

54.     As such, under 15 U.S.C. § 1681n(a), Plaintiffs and Class members are entitled to actual, statutory, and punitive damages in an amount to be

determined at trial, as well as the costs of the action together with reasonable attorneys' fees as determined by the Court.

## SECOND CLAIM

### Negligent Violations of the Fair Credit Reporting Act
### 15 U.S.C. § 1681 *et seq.*

55.     Plaintiffs hereby reallege and incorporate the preceding paragraphs as if fully stated herein.

56.     Plaintiffs bring this cause of action on their own behalf and on behalf of the Class.

57.     As previously discussed, the FCRA requires credit reporting agencies to adopt reasonable procedures to ensure the "maximum possible accuracy" of the consumer credit information they furnish to lenders. *See* 15 U.S.C. § 1681e.

58.     Equifax breached its duty by failing to adopt – let alone maintain and monitor – reasonable procedures to ensure the maximum possible accuracy of Plaintiffs' and Class members' credit information.

59.     Equifax reported to third-party lenders inaccurate credit information on Plaintiffs and Class members as a direct and proximate result of its negligence. Equifax's reporting of inaccurate information resulted in harm to Plaintiffs and Class members, including worse terms on loans or denials of loans. But for Equifax's negligent failure to adopt reasonable procedures to ensure the accuracy

21

of Plaintiffs' and Class members' credit information, they would not have

sustained harm.

60.    As the above allegations show, Equifax could and should have

reasonably foreseen the harms that resulted from its actions and inactions.

61.    Accordingly, under 15 U.S.C. § 1681o(a), Plaintiffs and Class

members are entitled to actual damages in an amount to be determined at trial, as

well as the costs of the action together with reasonable attorneys' fees as

determined by the Court.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and the Class,

respectfully request that this Court enter an order:

A.    Certifying this action as a class action under Rule 23 of the Federal

Rules of Civil Procedure and appointing Plaintiffs and their attorneys to represent

the Class;

B.    Awarding statutory, compensatory, and punitive damages against

Equifax, including interest as permitted by law;

C.    Providing injunctive relief, including requiring Equifax to (i)

implement new protocols, procedures, and practices that will ensure no further

harm to consumers, and (ii) disgorge Equifax's gross revenues and profits derived from its furnishing of inaccurate consumer reports;

D.      Awarding reasonable attorneys' fees and costs of litigation as provided by statute; and,

E.      Entering such further relief that the Court deems necessary or proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury of all claims and issues so triable.

DATED: September 1, 2022

/s/ Michael A. Caplan
Michael A. Caplan
Georgia Bar No. 601039
T. Brandon Waddell
Georgia Bar No. 252639
**CAPLAN COBB LLC**
75 Fourteenth Street NE, Suite 2700
Atlanta, Georgia 30309
Tele: (404) 596-5600
Fax:  (404) 596-5604
mcaplan@caplancobb.com
bwaddell@caplancobb.com

Eric H. Gibbs
Rosemary M. Rivas
David M. Berger
(*pro hac vice applications forthcoming*)

23

**GIBBS LAW GROUP LLP**
1111 Broadway, Suite 2100
Oakland, California 94607
Tele: (510) 350-9713
dmb@classlawgroup.com
ehg@classlawgroup.com
rmr@classlawgroup.com

Amy E. Keller
(*pro hac vice application forthcoming*)
**DICELLO LEVITT LLC**
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois 60602
Tele: (312) 214-7900
akeller@dicellolevitt.com

*Counsel for Plaintiffs and Proposed Class*